jms

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL P. CALLICRATE,                    )
                                          )
          Plaintiff,                      )
                                          )
vs.                                       )          Case No. 04-4008-JAR
                                          )
NEW AGE INDUSTRIAL CORPORATION, INC. )
AND JOHN DOES NOS. 1 THROUGH 10,          )
                                          )
          Defendants.                     )
_____ )
                                          )
NEW AGE INDUSTRIAL CORPORATION, INC., )
                                          )
          Counterclaim Plaintiff/Third-Party Plaintiff, )
                                          )
vs.                                       )
                                          )
MICHAEL P. CALLICRATE,                    )
                                          )
          Counterclaim Defendant,         )
                                          )
and                                       )
                                          )
NO-BULL ENTERPRISES, L.L.C.,  and         )
JOHN DOES NOS. 1 THROUGH 10,              )
                                          )
          Third-Party Defendants.         )
_____ )

## MEMORANDUM ORDER CONSTRUING DISPUTED CLAIMS AND GRANTING MOTION TO DISMISS

This matter is before the Court on the parties' request that the Court construe certain

patent claim language in accordance with *Markman v. Westview Instruments, Inc.*[1]  Also before

the Court is plaintiff/counterclaim defendant Michael P. Callicrate and third-party defendant No-

---

[1]52 F.3d 967, 979 (Fed. Cir. 1995), *cert. granted*, 515 U.S. 1192 (1995), *aff'd*, 517 U.S. 370 (1996).

Bull Enterprises, L.L.C.'s (No-Bull) Motion to Dismiss defendant/third-party plaintiff's New

Age Industrial Corporation, Inc.'s (NAIC) collateral estoppel affirmative defense/counterclaim

(Doc. 64). The parties fully briefed both motions. In addition, the Court held an evidentiary

hearing on the *Markman* issues on April 12, 2005. Having considered the papers submitted and

the parties' arguments at the hearing, the Court grants the Motion to Dismiss and construes the

disputed terms and phrases as set forth below.

## I. Background

Callicrate instituted this action against New Age Industrial Corp., Inc. (NAIC), claiming

that NAIC's Nu-Loop device infringes on two patents: U.S. Patent No. 5,681,329 (the '329

patent) and U.S. Patent No. 6,270,507 (the '507 patent). The '329 patent is entitled "Method and

Apparatus for Castration Using an Endless Elastic Loop" and claims, among other things, the

novel design of Callicrate's ES-10 ligation loops. Illustrations of the ES-10 loops taken from the

'329 patent appear below:



The '507 patent is entitled "Method and System for Raising and Castrating Cattle."  It claims, among other things, novel methods of using Callicrate's Smart Bander ligation tool and ES-10 loops in combination.  An illustration of the Smart Bander ligation tool taken from the '507 patent appears below:



Callicrate alleges that the Nu-Loop infringes on claim 10 of the '329 patent and that when used with Callicrate's Smart Bander to litigate an animal body part, infringes on claims 1-6, 32, and 33 of the '507 patent.  The parties dispute the construction of claim 10 of the '329 patent and claims 1, 32 and 33 of the '507 patent.

## II. The Inventions

Callicrate invented both the Smart Bander ligation tool and ES-10 ligation loop, which allow for ligation of animal body parts and are popularly used for bull castration.  Ligation is the process of binding a body part with a ligature.  In bull castration, the ligature is secured around the scrotum of a bull.  If properly secured, the scrotum is deprived of blood, atrophies and, with the passage of time, simply falls from the animal.

Originally, the Smart Bander tool was designed to receive a grommet through which ligation material passes.  The user would then manually form a loop from the ligation material that could be tightened around an animal body part.  Callicrate found it difficult and time-

3

consuming to form a loop by threading bulk ligation material through a grommet held in the end

of the tool.  In addition, the manual threading process was wasteful of ligation material.  To

address these problems, Callicrate invented ES-10 ligation loops.  ES-10 loops are preformed

endless loops of ligation material.  Callicrate also modified his Smart Bander tool to use the ES-

10 loops by adding a tether to the winding spool for pulling the loop.  To capitalize on these

inventions, Callicrate received patents on his Smart Bander tool, ES-10 loops, and methods for

using these devices, including the '329 and the '507 patents.

### III.  Applicable Law

The determination of patent infringement is a two-step process.  In resolving a claim of

patent infringement, a court must first determine the meaning and scope of the patent claims at

issue before the factfinder may resolve whether the accused device infringes the patent claims as

construed by the court.[2]  The construction of a patent, including terms of art within its claim, is a

question of law.[3]  In construing a patent claim, the Court looks to the three sources of intrinsic

evidence of record: the claims; the specification; and the prosecution history.[4]  The Court may

also consult extrinsic evidence to aid its understanding of claim terms.[5]

### A.  Intrinsic Evidence

The first step in claim construction is an examination of the language of the claims.[6]

---

[2]*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001).

[3]*See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 383-91 (1996).

[4]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

[5]*See Pitney Bowes, Inc. v. Hewlett-Packard Corp.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

[6]*Dow Chem. Co.*, 257 F.3d at 1372 (citing *Hockerson-Halberstadt, Inc. v. Avia Group Int'l., Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000)).

4

Patent claims are the numbered paragraphs at the end of the patent's specification.[7]  A construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claim itself, but consults these sources to give the necessary context to the claim language.[8]  As a starting point, courts accord "claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art."[9]  "Accordingly, a technical term used in a patent claim is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean."[10]  In constructing the person of ordinary skill in the art, the court should consider the educational level of the inventor, the type of problems encountered in the art, the prior art solutions to the problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of workers in the field.[11]

A heavy presumption exists that the terms in a claim are to be afforded their ordinary and customary meaning.[12]  The patentee may, however, choose to be his own lexicographer, and thus may use terms in a manner other than their ordinary meaning.[13]  In such a case, the Court must examine the intrinsic evidence to determine whether the patentee has given the terms an unconventional meaning.

Claims also must be read in view of the specification, which contains a written

---

[7]*Elf Atochem N. Am., Inc. v. Libbey-Owens-Ford Co.*, 894 F. Supp. 844, 858 (D. Del. 1995).

[8]*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997), *abrogated on other grounds by Cybor Corp v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998)).

[9]*Dow Chem. Co.*, 257 F.3d at 1372 (citation omitted).

[10]*Id.* (citation omitted).

[11]*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000) (citation omitted).

[12]*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

[13]*Vitronics*, 90 F.3d at 1582.

description of the invention that must enable one of ordinary skill in the art to make and use the invention.[14]  Thus, the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication, and "is the single best guide to the meaning of a disputed term."[15]  However, the specification "does not delimit the right to exclude.  That is the function and purpose of the claims."[16]

In addition, "the court should consider the patent's prosecution history . . . to ascertain the true meaning of the language used in the patent claim."[17]  "This 'undisputed public record' of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims."[18]  "[A]rguments made during prosecution shed light on what the applicant meant by its various terms."[19]  The Court must examine the prosecution history to determine whether the patentee has "relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference."[20]  In this way, the prosecution history limits the interpretation of claims so as to exclude any interpretation that was disclaimed during prosecution.[21]  While the prosecution history aids understanding of the language used in the

---

[14]*See* 35 U.S.C. § 112; *Markman*, 52 F.3d at 979.

[15]*Vitronics*, 90 F.3d at 1582.

[16]*Markman*, 52 F.3d at 980.

[17]*Id.*

[18]*Id.*

[19]*Laitram Corp. v. Morehouse Indus.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998).

[20]*Dow Chem. Co.*, 257 F.3d at 1373 (citation omitted).

[21]*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

claims, it "cannot enlarge, diminish, or vary the limitations in the claims."[22]

## B.  Extrinsic Evidence

"'Extrinsic evidence' is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."[23]  The Court may not "*rely* on extrinsic evidence in claim construction to contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history--the intrinsic evidence."[24]  The Court may, however, consult extrinsic evidence to aid its understanding of the patent.[25]  "[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."[26]

Because it is extrinsic evidence, opinion evidence on claim construction is no better than opinion testimony on the meaning of statutory terms.[27]  In interpreting patent claim language, the court should thus treat opinion testimony on claim construction with the utmost caution.[28]  In addition, the court should discount expert testimony that is not necessary, as when "the district court has concluded that the patent specification and the prosecution history adequately elucidate

---

[22]*Markman*, 52 F.3d at 980.

[23]*Vitronics*, 90 F.3d at 1584.

[24]*Pitney Bowes, Inc.,* 182 F.3d at 1308 (emphasis in original).

[25]*Vitronics*, 90 F.3d at 1584 n.6.

[26]*Pitney Bowes*, 182 F.3d at 1309.

[27]*Vitronics*, 90 F.3d at 1585.

[28]*Id*.

the proper meaning of the claims."[29]

## IV.  Analysis

### A.  The '329 patent

Only one claim from the '329 patent is in suit in this litigation, claim 10, which reads as follows:

> An endless ligation loop consisting essentially of an elastomeric ligature material secured together by a connection means, said ligation material having a deformable grommet attached thereto and in sliding engagement therewith, said grommet, upon being deformed, securely fastening said ligature material without significantly damaging said material.

The parties dispute the meaning of each clause in claim 10.  The primary disagreement, however, concerns the meaning of the phrase "connection means."   NAIC urges that the prosecution history of the '329 patent limits the meaning of "connection means" to a wire and expressly excludes a grommet.  In addition, NAIC refers to the prosecution history to support other proposed claim interpretations.  Thus, before discussing the construction of the individual clauses, the Court begins with a summary of the prosecution history of the patent.

### Prosecution History

Callicrate's original application for the '329 patent included twenty claims, eight of which were directed to a loop for castration.  The Examiner noted that dependent claims 2, 4, and 16 would be allowed if rewritten in independent form to include all limitations of the claim from which they depended. The Examiner rejected proposed claims 1, 3, 4, 6-15 and 17-20.  Only claim 5 was allowed as presented.

As originally proposed, claim 13, which ultimately issued as claim 1 in the '329 patent,

---

[29]*Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997).

disclosed: "An endless ligation loop comprising an endless band of elastomeric ligation material

having a deformable grommet attached thereto."  The Examiner rejected claim 13 as being

anticipated by U.S. Patent No. 5,459,905 issued to Voyre (Voyre).  Voyre is directed to a device

for bundling documents, consisting of a rubber band that is doubled over with two sliding

grommets, which must be loosely attached to the rubber band.  The rubber bands are connected

through a vulcanization or sealing process.  The grommets are attached at band intersections and

allow the band to be configured into a "cruciformic" shape.  The rubber band binder can then be

used to secure folders or documents.  In rejecting claim 13 as being anticipated by Voyre, the

Examiner noted:

> Note Voyre figures 1-3, and 7: elongated rubber band (1) is an endless band of
> elastomeric material; retaining element (21) is a grommet which is made of metal
> and therefore deformable; the grommet has parallel opposing side walls in the
> same manner that Applicant's contains such feature; the endless band is made by
> overlapping the ends and sealing them together . . . .

Callicrate subsequently amended claims 1, 4, 6, and 9 and presented new claims 21-28

for consideration.  Callicrate also rewrote claims 2, 4, and 16 in independent form as new claims

29-31.  Claim 31, which subsequently issued as claim 8 in the '329 patent, originally read as

follows:

> An endless ligation loop comprising an endless band of elastomeric ligation
> material having a deformable grommet attached thereto wherein said endless loop
> is formed by connecting two ends of an endless elastomeric band, said ends
> connected by a wire, said loop having a circumference to allow passage of an
> animal's body part therethrough.

The Examiner rejected claim 31 as being obvious in light of Voyre stating:

> Voyre discloses the invention substantially as claimed.  However, Voyre does not
> disclose the ends of the band are connected by a wire.  It would have been
> obvious to one having ordinary skill in the at the time the invention was made to
> use a wire to connect the ends of the rubber band, in lieu of sealing them, as an art

recognized equivalent because such afterthought limitation solves no stated problem in the art.

Following the Examiner's rejection of claim 31 on obviousness grounds, Callicrate submitted a draft Amendment and Response to the Examiner.  This draft Amendment and Response was for discussion purposes only and was provided to the Examiner one day before a scheduled telephonic interview.  In the draft Amendment and Response, Callicrate proposed amending claims 13, 21, 30 and 32.  As amended, proposed claim 13 disclosed: "An endless ligation loop comprising an endless band of elastomeric ligature material having a deformable grommet slidably attached thereto, said endless loop formed by securely connecting two ends of said ligature material by a wire."

In addition to amending claim 13, Callicrate proposed new claims 33 and 34, but made no changes to claim 31.  Claims 33 and 34, like claim 31, were directed to an endless ligation loop. Proposed claim 33, which subsequently issued at claim 9 in the '329 patent, disclosed:

> An endless ligation loop comprising an endless band of elastomeric ligature material having a deformable grommet attached thereto, said endless loop formed by connecting two ends of an endless elastomeric band by a wire, said wire having an integral hook attachable to a means for pulling.

Proposed claim 34 ultimately issued after amendment as claim 10 in the '329 patent, the claim here at issue.  As originally proposed, claim 34 stated:

> An endless ligation loop comprising elastomeric ligature material secured together by a connection means, said ligation material having a deformable grommet attached thereto and in sliding engagement therewith, said grommet, upon being deformed, securely fastening said ligature material without significantly damaging said material.

The Examiner and Callicrate's attorney then had a telephonic interview.  During the interview, claims 13, 31, 33, and 34 were discussed in light of Voyre.  The Examiner's notes

10

memorialize the interview as follows:

> [T]he Examiner stated that Voyre would still be applicable to claims 13, 31 and
> 34.  Agreement was made that an affidavit showing the criticality of using a wire
> to connect the ends of the elastomeric band would overcome the obviousness
> rejection based on Voyre and the design choice doctrine (claims 13 and 31).  In
> claim 34, agreement was made that using the transition phrase "consisting" to
> limit the claim to only one grommet would overcome the rejection based on
> Voyre who only discloses two grommets, there being no motivation to eliminate
> one grommet without destroying the operation of the device.

Callicrate continued to maintain that proposed claims 13, 31 and 34 were patentable over

Voyre even after the telephone interview with the Examiner.  However, as requested by the

Examiner, Callicrate provided a declaration stressing the importance of using a wire to connect

the ends of the ligation band.  The declaration stated that "[c]laims 13 and 31 explicitly include a

limitation that elastomeric material is formed by connecting two ends of an endless elastomeric

band by a wire. . . . . it is critical to have the two ends connected in a manner that will not permit

breakage or slippage of the elastomeric material during a ligation operation."  In addition, the

declaration states that the sealing process of connecting the rubber bands taught by Voyre would

not be sufficient for ligation as the rubber could not withstand the ligature operation.  The

declaration further states:

> In the embodiment of the present invention set forth in claims 13 and 31, it has
> been found that the use of a length of wire to securely fasten two ends of
> elastomeric material to form an endless loop is a preferred embodiment of the
> present invention since the wire firmly connects the ends of the ligature material
> in a fashion that does not permit slippage of the ends of the ligature material and
> ensures the integrity of the endless loop during a ligature operation.

In addition, to solve the Voyre rejection with regard to claim 34, Callicrate proposed

claim 34 in amended form.  The Examiner's notes reflect that the parties agreed to modify claim

34 by replacing the open transitional phrase "comprising" with the transitional phrase

11

"consisting."  By referring merely to "consisting" it is unclear from the Examiner's notes whether he intended that Callicrate use the closed transitional phrase "consisting of" or the partially open transitional phrase "consisting essentially of."  In any event, Callicrate replaced the transitional phrase "comprising," with the partially open transitional phrase "consisting essentially of," in his amended claim 34 "to avoid any possibility of an obviousness rejection predicated on the Voyre reference."

In response to Callicrate's amendment and declaration, the Examiner filed a "Notice of Allowability."  In the "Detailed Action" section of the Notice, the Examiner stated:

> The declaration under 37 CFR 1.132 filed 08 January 1997 is sufficient to overcome the rejection of claims 13-14, 17-20, and 31, based upon Voyre. In light of the declaration, the Examiner concludes that the forces necessary to occlude the flow of blood into the scrotum and testicles of a bull are much greater than those necessary to bind papers.  Further, the Examiner finds that the binding of the ends of an elastic material to form an endless loop is critical to the operation of Applicant's device, and would therefore not be an obvious design choice.

No discussion of Callicrate's amendment to claim 34 to include the phrase "consisting essentially of" appears in the Notice.  Ultimately, the Examiner allowed claims "1-14, and 17-34, renumbered 1-32, but not necessarily in that order."

**Claim Construction**

With this detailed understanding of the prosecution history of the '329 patent in mind, the Court turns to the construction of claim 10.  As previously stated, claim 10 provides:

> An endless ligation loop consisting essentially of an elastomeric ligature material secured together by a connection means, said ligation material having a deformable grommet attached thereto and in sliding engagement therewith, said grommet, upon being deformed, securely fastening said ligature material without significantly damaging said material.

**1.  Preamble: "an endless ligation loop consisting essentially of"**

12

The parties dispute the meaning of the preamble to claim 10, "an endless ligation loop consisting essentially of."  Two components in the preamble require definition, the description of the claimed device, "an endless ligation loop"; and the transitional phrase, "consisting essentially of."

### a.  "an endless ligation loop"

Callicrate's proposed construction of the phrase "an endless ligation loop" is "a loop for use in ligation."  NAIC urges that the phrase means "a band of rubber or surgical tubing." NAIC, however, provides no discussion for this construction in its *Markman* brief.  NAIC's construction is apparently directed at the material from which the ligature material must be constructed.  In this way, NAIC's construction applies not to the preamble of claim 10, but rather the second element of claim 10, which further defines the ligature material by disclosing "an elastomeric ligature material."  Thus, the Court addresses NAIC's proposed interpretation of elastomeric ligature material as "a band of rubber or surgical tubing," in its consideration of the second element of claim 10 below.  The Court further adopts Callicrate's proposed interpretation of the phrase "an endless ligation loop" from the preamble as simply a loop for use in ligation.

### b.  "consisting essentially of"

Callicrate originally argued that the phrase "consisting essentially of" should be distilled to mean "having at least the following elements."  During oral argument at the *Markman* hearing, however, Callicrate retreated from the position and proposed that the phrase instead be construed as, "having only the following material elements but may also include additional nonmaterial items."  NAIC proposes the following interpretation: "having only the following essential items."  NAIC suggests that the phrase must be interpreted as limiting the scope of the

13

claim to include only the enumerated crucial elements, particularly limiting the claim to include

only devices that contain one grommet.  NAIC's reference to devices that contain one grommet

refers to the phrase "connection means" and will be discussed *infra*, when the Court construes

that phrase.

### Claim Language

In patent parlance, the transitional phrase "consisting essentially of" has a special

meaning.[30]  "Consisting essentially of" is a transition phrase commonly used to signal a partially

open claim in a patent.[31]  "Typically, 'consisting essentially of' precedes a list of ingredients in a

composition claim or a series of steps in a process claim."  By using the term "consisting

essentially of," the drafter signals that the invention necessarily includes the listed ingredients

and is open to unlisted ingredients that do not materially affect the basic and novel properties of

the invention.[32]  A "consisting essentially of" claim therefore occupies a middle ground between

closed claims that are written in a "consisting of" format and fully open claims that are drafted in

a "comprising" format.[33]  Thus, the claim language supports the interpretation proposed by

Callicrate at the *Markman* hearing.

### Prosecution History

NAIC urges that its interpretation of the phrase "consisting essentially of" is inconsistent

with the agreements reached between Callicrate and the PTO Examiner in arriving at the

---

[30]*AK Steel Corp. v. Sollac & Ugine*, 234 F. Supp. 2d 711, 768 (S.D. Ohio 2002) (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998)).

[31]*PPG Indus.*, 156 F.3d at 1354.

[32]*Id.*

[33]*Id.* (citation omitted).

issuance of the claim.  NAIC refers to the Examiner's request that Callicrate amend claim 34 to include the term "consisting."  NAIC assumes that by "consisting," the Examiner meant "consisting *of*."  Thus, NAIC argues that Callicrate failed to heed the Examiner's advice when amended claim 34 was submitted with the phrase "consisting *essentially of*."  Yet, the Examiner did not reject this language in claim 34, but rather approved claim 34 without comment on the inclusion of this phrase.  In light of the well-established meaning of transitional phrases in patent claims, it is highly unlikely that the examiner approved claim 34 with the phrase "consisting essentially of," if the examiner intended for the claim to be construed in a closed format.[34] Moreover, Callicrate's amendment is consistent with the Examiner's suggestion that claim 34 be amended to include the term "consisting," as the Examiner did not specify whether he was referring to the partially open phrase "consisting essentially of," or the closed phrase "consisting of."  The prosecution history, like the claim language, therefore supports Callicrate's proposed interpretation.  As such, the Court will construe the phrase "consisting essentially of," to connote "having only the following material elements, but may also include additional nonmaterial items," according to its plain and ordinary meaning.

**2.  Second Element: "an elastomeric ligature material secured together by a connection means"**

The second element of claim 10 has two components that require construction.  The Court must interpret the phrase "elastomeric ligature material" and the phrase "secured together by a connection means."

---

[34]*See Boeing Co. v. United States*, 57 Fed. Cl. 22, 28 (Fed. Cl. 2003) (characterizing defendant's attempt  to give the usually open-ended "consisting essentially of" the close-ended meaning ordinarily ascribed to "consisting of" as "linguistic legerdemain").

15

### a. "elastomeric ligature material"

Callicrate's proposed interpretation of the phrase "elastomeric ligature material" is "a length of ligature material having elastic properties."  NAIC proposes the following meaning: "the band of rubber or surgical tubing."  While NAIC seeks a different construction of the phrase than Callicrate, NAIC does not provide any argument to support its construction.

**Claim language**

As always, the Court begins by examining the language of the claim itself, giving terms their ordinary meaning.  The ordinary meaning of "elastomeric" is "any of various elastic substances resembling rubber."[35]  Unlike NAIC's construction of the term, the ordinary meaning does not restrict elastomeric ligature material to rubber or surgical tubing.  Rather, the ordinary meaning of the term supports Callicrate's proposed interpretation.

**Specification**

The specification of the '329 patent sheds light on Callicrate's intended meaning of the phrase "elastomeric ligature material."  The specification states as follows:

> In a preferred embodiment, the endless loop is manufactured from an elastomeric material having resistance to e [sic] strength that is resistant to abrasion and tearing.  More preferably, the elastomeric material is comprised of non-hollow rubber material either molded or extruded to produce a finished elastomeric product with ends.  As such, one aspect of the present invention relates to an endless ligation loop wherein the endless loop comprises a non-hollow elastomeric material.

The specification's reference to non-hollow tubing also suggests that NAIC's proposed interpretation, which would limit the ligature material to hollow surgical tubing is in error.

Thus, the Court adopts Callicrate's proposed construction of the phrase "elastomeric ligature

---

[35] MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 370 (10th ed. 1996).

material," and construes the phrase to mean "a length of ligature material having elastic properties."

**b. "secured together by a connection means"**

The parties also disagree on the construction of the phrase "secured together by a connection means." Callicrate argues that the phrase means "secured together at its ends by a connection means, the connection means including a clip, wire band, grommet or other equivalent device that prevents the two ends from being separated." Contrarily, NAIC suggests the following construction: "bound together by a wire, this wire having an end piece capable of being attached to a means for winding or pulling, when the single grommet discussed below is attached an hour glass shape results, this shape having a forward loop end having sufficient circumference to allow it to be easily placed around a selected body part of an animal, such as a scrotum." Thus, in addition to construing the phrase "connection means," the Court must discern whether the loop: (1) must form an hourglass shape; (2) must have an end piece capable of being attached to a means for winding or pulling; and (3) must be of a certain circumference.

**Claim language**

The use of the word "means" invokes special rules for interpreting the scope of a claim, namely raising the presumption that Callicrate invoked the statutory mandates of 35 U.S.C. § 112 ¶ 6.[36]  Section 112 ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means . . . for performing a special function without the recital of structure, material, or acts in support thereof, and such claims shall be construed to cover the corresponding structure, material, or act described in the specification and equivalents thereof.

---

[36]*See Sage Prods., Inc. v. Devon Indus.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997).

17

The scope of a "means plus function" element is therefore limited to structures described in the patent specification for performing the claimed function and their structural equivalents.[37]  Thus, the Court must examine the specification to ascertain the meaning of "connection means."

**Specification**

The specification for the '329 patent provides:

> As an alternative to using a manufactured preformed elastomeric loop without ends, an elastomeric endless loop may be formed by attaching or connecting the two ends of a straight length of an elastomeric band of rubber or surgical tubing with a clip, wire band, grommet, or other device which prevents the two ends from being separated.

The reference in the claim to a "connection means," the concomitant invocation of the statutory mandates of 35 U.S.C. § 112 ¶ 6, and the inclusion in the specification of devices to perform the connection function strongly suggest that the "connection means" referred to in claim 10 is limited to a clip, wire band, grommet, or other equivalent device.  As such, both the claim language and the specification support Callicrate's proposed claim construction.

**Prosecution History**

NAIC argues that, notwithstanding Callicrate's use of a means plus function element, the prosecution history of the '329 patent evidences that the "connection means" is limited to a wire and specifically excludes grommets.  NAIC points to Callicrate's declaration citing the importance of a wire and Callicrate's amendment of claim 34 to change the phrase "comprising" to "consisting essentially of."

NAIC's expert, Jeffrey Shelton opined at the hearing in this matter that, based on his review of the prosecution history, this amendment of claim 34 limited the "connection means" to

---

[37]*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307-08 (Fed. Cir. 1998).

a wire or a clip, but specifically excluded a grommet.  Callicrate also presented a witness, Joseph Kovarik, although he testified not as an expert, but rather as a fact witness.  Kovarik, the patent attorney who prosecuted the '329 patent on behalf of Callicrate, presented his version of events that transpired between himself and the Examiner.  The testimony of both experts is extrinsic evidence, which the Court considers *only* for the purpose of understanding the invention.

NAIC supports its argument that the "connection means" may not be a grommet by referring to the prosecution history, not only of claim 10, but also of claims 1 and 8, and focuses in particular on the Examiner's rejection based on Voyre.  As set forth more fully in the discussion of the prosecution history, the Examiner rejected claim 13 (now claim 1), claim 31 (now claim 8), and claim 34 (now claim 10) as being unpatentable in light of Voyre.  In allowing claims 13 and 31, the Examiner required Callicrate to submit a declaration citing the criticality of the use of a wire to connect the ends of the ligature material.  Because Voyre disclosed a sealing process as a means of connection, Callicrate's utilization of a wire in claims 13 and 31 avoided an obviousness rejection based on Voyre.

The Examiner did not require Callicrate to utilize a wire to connect the ends of the ligature material in claim 34, however.  Instead, the Examiner allowed Callicrate to change the transitional phrase "comprising of" to the more restrictive phrase "consisting essentially of" in order "to limit the claim to only one grommet.  Limiting the claim to one grommet avoided an obviousness rejection based upon Voyre because, as the Examiner explained, there was no motivation to eliminate one grommet without destroying the operation of Voyre's device.

NAIC argues that the Examiner's reference to "one grommet" refers to both a slidable deformable grommet as well as a deformed grommet used as a "connection means."  As a result,

NAIC reasons that the "connection means" referred to in claim 10 may not include a grommet. The Court disagrees.  The Examiner's statement, coupled with Callicrate's amendment of the phrase "comprising of" to "consisting essentially of," are "far too slender a reed to support the judicial narrowing of a clear claim term."[38]  Indeed, the Court finds that the grommet to which the Examiner referred in his discussion of what is now claim 10, was clearly a slidable, deformable grommet, as this was the grommet contemplated by Voyre, and the only grommet that when removed, would destroy the operation of the Voyre device.   The means for connecting the rubber band contemplated by Voyre was not a deformed grommet, but rather a vulcanization or sealing process.  Thus, the prosecution history does not support NAIC's suggestion that the "connection means" in claim 10 may not include a deformed grommet.  Nor must the "connection means" be limited to a wire, as such a limitation was never required during the prosecution of claim 10.  Thus, the Court determines that the prosecution history, like the claim language and specification, unambiguously supports Callicrate's proposed interpretation of the phrase.

Because the intrinsic evidence resolves any ambiguities in the claim terms, the Court concludes that the expert testimony is unnecessary and the Court does not rely on this evidence for claim interpretation.  The Court finds it unnecessary to strike offending expert testimony from the record.[39]  However, the Court disavows any reliance on such evidence in its claim

---

[38]*Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (declining to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous).

[39]During the *Markman* hearing, NAIC objected to the testimony of Joseph Kovarik.  Similarly, Callicrate objected to the testimony of Jeffrey Sheldon.  At that time, the Court took the objections under advisement.

construction.[40]

In particular, the Court does not rely on the testimony of Callicrate's witness, Joseph Kovarik. Mr. Kovarik merely provided his account of the events that occurred during the prosecution of the '329 patent. The entire prosecution history is already before the Court, and it is this fixed, public record, not Mr. Kovarik's account of the prosecution history, that guides the Court's interpretation of the claim language. Nor does the Court rely on Mr. Shelton's expert testimony. Mr. Shelton's proffered interpretation of the phrase "connection means" conflicts with the construction mandated by the intrinsic evidence; thus, this testimony adds nothing to the claim construction calculus.

**Claim Differentiation**

Callicrate also asserts that the doctrine of claim differentiation requires the "connection means" element in claim 10 to be construed to allow structures other than a wire. The doctrine of claim differentiation is based on the common sense notion that different words or phrases used in separate patent claims are presumed to indicate that the claims have different meanings and scope.[41] It prevents the narrowing of broad claims by reading into them the limitations of narrow claims.[42] Under the doctrine of claim differentiation, each claim in a patent is presumptively different.[43] The presumption is, however, rebuttable.[44] Claim differentiation is not a hard and

---

[40]*See, e.g., Markman*, 52 F.3d at 983 (finding that, at least as to expert opinions that are merely legal opinions, "the court has complete discretion to adopt the expert legal opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it.").

[41]*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999).

[42]*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000).

[43]*Intermatic Inc. v. Lamson & Sessions Co.*, 273 F.3d 1355, 1364 (Fed. Cir. 2001).

[44]*Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341 (Fed. Cir. 2000).

fast rule of patent construction, and, therefore, cannot be relied upon to broaden claims beyond their correct scope.[45]  Nor can it be used to overcome the plain language of the claims themselves.[46]

Claim 8 of the '329 patent specifies connecting the ends of ligation material together with a wire.  On the other hand, claim 10 merely refers to a connection means.  Callicrate argues that if claim 10 is construed as limiting the connection means to a wire and excluding a grommet, as urged by NAIC, claim 10 would have the same meaning as claim 8.  The Court agrees that NAIC's proposed interpretation would render the distinction between claim 8 and claim 10 virtually meaningless.  Thus, the doctrine of claim differentiation further supports Callicrate's proposed interpretation of the phrase "connection means."

In sum, the Court construes the phrase "connection means," in accordance with the intrinsic evidence, the claim language, the specification, the prosecution history, and the doctrine of claim differentiation, to mean "a clip, wire band or grommet or other equivalent device that prevents the two ends from being separated."  In so construing the claim language, the Court rejects extrinsic evidence offered by both parties as "the patent specification and the prosecution history adequately elucidate the proper meaning of the claims."[47]

**Size of Endless Loop**

NAIC contends that the forward ends of the endless loop must be large enough so that it can be easily placed around a body part of an animal to be ligated.  This limitation does not

---

[45]*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001).

[46]*Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001).

[47]*See Trilogy Communications*, 109 F.3d at 744.

appear in the language of claim 10.  NAIC directs the Court to the specification, which address

the circumference of the endless loop:

> More preferably, the forward loop 108 should be of sufficient circumference to
> allow it to be easily placed around a selected body part of an animal, such as a
> scrotum.  The rearward loop 110 preferably has a circumference large enough to
> either allow the attachment of a hook attached to a winding tether 106 (or other
> pulling means), or to be placed over a prong 102 extending from the winding
> spool 38.

Additionally, NAIC argues that the specification makes clear that the ES-10 endless loop

invention does not include elastic loops that must be stretched over an animal body part.  To

support this argument, NAIC points to portions of the specification, which detail problems in the

prior art, namely the stretching of elastic bands to encircle a body part.  According to the

specification, the conventional method of stretching the bands is disadvantageous in that it is

difficult to attach the ligature band that is sufficiently tight; the tightness of the elastic band

when positioned on an animal body part is limited by the band's elasticity.  These prior art

elastic bands, which are available in a limited number of band sizes, generally cannot be

tightened so the size of the band can only be roughly matched to a particular application.

NAIC is correct that when inventors distinguish their invention from the prior art, that

prior art is properly excluded from the claim's coverage.[48]  This is so because interpretation of

patent claim terms can only be determined with full understanding of what the inventors actually

invented and intended to develop within the claim.[49]  In this case, Callicrate's ES-10 endless

loop invention claims to solve the problems associated with the lack of tightness of the elastic

---

[48]*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 267 F. Supp. 2d 533, 543 (N.D. W. Va. 2003) (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc*, 242 F.3d 1337, 1343 (Fed. Cir. 2001)).

[49]*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

bands which results from their stretching to fit over an animal body part by "allow[ing] a ligature band to be tightly attached to an animal body part . . . ." Once Callicrate's endless loop is pulled to a desired tension by the Smart Bander ligation tool, the loop is secured in a fixed position by crimping a grommet. Thus, Callicrate's invention does not depend on the band being large enough that it need not be stretched to solve the prior art problem. Rather, Callicrate solves this problem by providing a mechanism, the Smart Bander ligation tool, to adequately tighten the band and a preattached grommet to secure the band once it is in a tightened condition.

Bearing in mind that the ES-10 endless loop need not be sufficiently large to solve the prior art problems, the Court concludes that the reference to the sufficient circumference of the ligation loop is merely a preferred embodiment. First, the Court notes that no limitation upon the size of the loop is stated in the claim language itself. Additionally, the specification states, "*[m]ore preferably*, the . . . loop . . . should be of sufficient circumference to allow it to be easily placed around a selected body part of an animal."[50] As the Federal Circuit has held, "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations."[51] Thus, the Court rejects NAIC's attempt to read an a endless loop size requirement into claim 10.

**Hourglass Shape**

Although defendant proposes that claim 10 be construed to include a loop in an hourglass configuration, it provides no argument in its *Markman* brief to support this construction. Defendant apparently relies on a preferred embodiment referenced in the specification, as the

---

[50]Emphasis added.

[51]*Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1068 (1989).

claim itself does not teach an hourglass configuration.  The specification states in relevant part:

> *Preferably*, the grommet 32 is attached to the endless loop 100 between a forward
> end and rearward end of the endless loop, thus forming a forward loop 108 and
> rearward loop 100, similar to a modified figure-eight or hour-glass configuration.
> The forward loop 108 extends forward of the receiving end of the tool and the
> rearward loop 110 extends rearward of the receiving end of the tool.[52]

As previously articulated by the Court, "references in the specification to a preferred

embodiment, or an illustrative example, do not limit the scope of the patent claims."[53]  Without

any other basis to construe claim 10 in this manner, the Court must reject NAIC's proposed

inclusion of an hourglass shape.[54]

**End Piece**

NAIC also urges the Court to construe claim 10 such that the endless loop has an end

piece capable of being attached to a means for winding or pulling.  No such limitation appears in

the language of claim 10.  An incorporated hook for this purpose is specified in claim 9, not in

claim 10.  In addition, Figure 15 illustrates an endless loop with an attached hook.  The

specification further provides:

> The rearward loop 100 *preferably* has a circumference large enough to either
> allow the attachment of a hook attached to a winding tether 106 (or other pulling
> means), or to be placed over a prong 102 extending from the winding spool 38.[55]

Thus, NAIC is again attempting to incorporate preferred embodiments, as disclosed in the

specification and accompanying illustration, into the claim language.  The Court may not limit

---

[52]Emphasis added.

[53]*Kemco Sales, Inc. v. Control Papers Co.*, 93 F. Supp. 2d 563, 570 (D.N.J. 1998), *aff'd*, 208 F.3d 1352
(Fed. Cir. 2000).

[54]*See N. Telecom Ltd. v. Samsung Elecs., Co.*, 215 F.3d 1281, 1293 (Fed. Cir. 2000) ("But preferred
embodiments, without more, do not limit claim terms.").

[55]Emphasis added.

the claim language to a preferred embodiment.[56]  In addition, NAIC asks the Court to read the limitation in claim 9, which discloses an incorporated hook, into claim 10, which does not require such a hook.  But, "[w]here some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement."[57]  The Court consequently declines NAIC's invitation to read the narrow limitations of claim 9 into claim 10.

**3.  Third Element: "said ligation material having a deformable grommet attached thereto and in sliding engagement therewith"**

The third element of claim 10 has two components that require construction.  The Court must interpret the phrase "deformable grommet" and the phrase "attached thereto and in sliding engagement therewith."

**a.  "deformable grommet"**

**Claim Language**

Callicrate proposes that the phrase "deformable grommet" be defined as "a grommet that is capable of being deformed."  On the other hand, NAIC argues that the phrase means "a single deformable grommet, preferably made from rolled flat wire," but provides no analysis or argument to support its proposed interpretation.  The ordinary meaning of "deform" is "to alter the shape of by stress."[58]  The ordinary meaning of "grommet" is "a flexible loop that serves as a

---

[56]*See N. Telecom Ltd.*, 215 F.3d at 1293.

[57]*United States v. Teletronics, Inc.*, 857 F.2d 778, 784 (Fed. Cir. 1988).

[58]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 303 (10th ed. 1996).

fastening, support, or reinforcement."[59]  A limitation or preference that the grommet be made of rolled flat wire is thus not suggested by giving the phrase "deformable grommet" its ordinary meaning.

### Specification

The specification does refer to a grommet consisting of rolled flat wire.  The specification states: "[*m]ore preferably*, the grommet is comprised of rolled flat wire with a length and width sufficient to prevent the ligature material from slipping through the grommet 32 after the grommet 32 is deformed upon the endless loop 100."[60]  This reference to rolled flat wire clearly evidences a preferred embodiment and does not limit the claim.  The Court notes that the specification also states that the grommet "can be formed from aluminum or other deformable material" and "can be of any desired shape and dimension."  Thus, the Court declines to limit the grommet to one "preferably consisting of rolled flat wire," and instead adopts Callicrate's proposed construction.

## b.  "attached thereto and in sliding engagement therewith"

### Claim language

Callicrate urges that the phrase "attached thereto and in sliding engagement therewith" means "attached to the ligature material in a manner that allows the ligature material to slide through the grommet."  NAIC contrarily urges the Court to adopt the following construction: "loosely attached to the band so as to allow movement of said ligature material through said grommet."  The claim language does not require the grommet to be "loosely" attached to the

---

[59]*Id.* at 514.

[60]Emphasis added.

endless loop, nor does it otherwise qualify the way in which the grommet must be attached to the endless loop.  The Court thus turns to the specification.

**Specification**

NAIC does not provide any argument to support its proposed inclusion of the term "loosely" into the construction of the claim language.  Nevertheless, the Court assumes that this interpretation is based upon the specification, which states:

> The pre-attached grommet 32 *must* be loosely attached to the band in a manner that allows the ligature material to slip through the grommet 32 until desired tension on the body part is achieved.  At such time, the grommet 32 is deformed to permanently secure the tightened band around the body part.[61]

The specification is not stated in terms of a preferred embodiment, but rather states that the grommet "*must* be loosely attached" to the ligature material.  In this way, the specification acts as a dictionary and explains how the grommet must be attached to the band.  Thus, the Court construes the phase "attached thereto and in sliding engagement therewith" to mean "loosely attached to the ligature material in a manner that allows the ligature material to slide through the grommet."

**4.  Fourth Element: "said grommet, upon being deformed, securely fastening said ligature material without significantly damaging said material"**

The fourth element of claim 10 has two components that require construction.  The Court must construe the phrase "securely fastening said ligature material" and the phrase "without significantly damaging said material."

**a.  "securely fastening said ligature material"**

**Claim language**

_____

[61]Emphasis added.

Callicrate urges that the phrase "securely fastening said ligature material" means "securely fastening the ligature material."  On the other hand, NAIC proposes the following construction: "being crimped in a manner sufficient to hold two bands together so as to retain the loop in a tensive condition."  The claim language, however, provides only that the grommet securely fasten the ligature material.

**Specification**

Even though the claim language does not require that the loop be held in a tensed condition, NAIC argues that "the specification and the entire background from which the invention claimed springs" demonstrate that such a limitation is proper.  The specification states:

> The grommet 32 must be capable of being properly crimped in a manner sufficient to hold two bands together so as to form a loop 20 of ligature material. The grommet 32 *must* retain the loop 20 in a tensive condition during the atrophy process which may take several weeks.  Further the grommet 32 is designed so as to securely fasten the ligature material without significantly damaging the material.[62]

The specification in this case explains that to be securely fastened, the grommet must retain the loop in a "tensive condition."  This is crucial for the proper function of the endless loop, which must remain in place for several weeks during the atrophy process.  Indeed, Callicrate identified a problem in the prior art with bands that are difficult to attach such that they are sufficiently tight.  Callicrate's endless loop invention with an attached deformable grommet claims to solve this problem by allowing the ligature band to be "tightly attached to an animal body part."  Thus, the Court concludes that the phrase "securely fastening said ligature material" means that the loop must be secured so as to retain the endless loop in a tensive condition.

---

[62]Emphasis added.

29

**b.  "without significantly damaging said material"**

Finally, the parties disagree on the phrase, "without significantly damaging said material," in claim 10 of the '329 patent.  Callicrate asks the Court to construe the phrase as "without causing significant damage to the ligature material."  NAIC asks the Court to adopt the following meaning: "without causing damage to the surgical tubing."[63]  The Court notes that although the term "significantly" appears in both the claim language and the specification, NAIC provided no argument in its *Markman* brief or at the April 12, 2005 hearing to support its deletion of the term from its proposed construction.  NAIC's proffered construction would require the grommet to securely fasten the loop without causing *any* damage to the ligation material and clearly conflicts with the claim language and specification.  Thus, the Court rejects NAIC's urged interpretation that would omit the term "significant" and adopts Callicrate's proposed interpretation.

To summarize, the Court lists its construction of claim 10 of the '329 patent below:

| Claim Language | Court's Construction |
|---|---|
| An endless ligation loop consisting essentially of | A loop for use in ligation having only the following material elements, but may also include additional nonmaterial items |
| an elastomeric ligature material secured together by a connection means | a length of ligature material having elastic properties secured together by a clip, wire band or grommet or other equivalent device that prevents the two ends from being separated. |

---

[63]The Court has already addressed and rejected NAIC's attempt to limit the ligature material to surgical tubing.  See the Court's construction of "elastomeric ligature material" at *supra*, Part IV.A.2.a.

| Claim Language | Court's Construction |
|---|---|
| said ligation material having a deformable grommet attached thereto and in sliding engagement therewith | a grommet that is capable of being deformed loosely attached to the ligature material in a manner that allows the ligature material to slide through the grommet |
| said grommet, upon being deformed, securely fastening said ligature material without significantly damaging said material. | the grommet, upon being deformed, must secure the ligature material in a manner sufficient to hold two bands together so as to retain the loop in a tensive condition without causing significant damage to the ligature material. |

**B.  The '507 patent**

The parties dispute the construction of claims 1, 32 and 33 of the '507 patent; all of which describe a method for ligating an animal body part using Callicrate's Smart Bander tool and the ES-10 loop in combination.  Certain claims of the '507 patent are also the subject of Callicrate and No-Bull's Motion to Dismiss NAIC's collateral estoppel affirmative defense/counterclaim.  The Court turns first to the disputed claim language before discussing the motion to dismiss.

**Claim Construction**

**1.  Claim 1**

Claim 1 states as follows:

A method for ligating an animal body part, comprising:
attaching a preformed endless loop of elastomeric material to a ligation tool;
passing said loop around a body part of an animal to be ligated;
pulling said loop using said tool to tighten said loop around said body part;
pivoting a lever, said lever having a rearward end and said lever being mounted
on said tool and movable between a retracted position and an extended position
by urging the rearward end of said level downwardly for crimping a grommet
about said loop so that said loop maintains pressure around said body part of said
animal.

The parties dispute the construction of the term "comprising" and the phrase "preformed endless

loop."

### a. "Comprising"

Callicrate construes the term "comprising" to mean "including the following steps." On the other hand, NAIC asks the Court to simply construe the term as "comprising." The transitional term "comprising" has a special meaning in patent parlance. "Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."[64] Stated slightly differently, "comprising" means "that the claim includes, but is not limited to, the elements thereafter presented."[65] It is synonymous with the word "including."[66]

NAIC argues that because "comprising" is a term of art, it should not be replaced with other "inferior" terms. At the same time, NAIC agrees that the term "comprising" is synonymous with "including." This claim construction dispute is thus largely a matter of semantics. Because both parties agree on the plain meaning of the term "comprising," the Court construes the term accordingly; "comprising" as used in the preamble to claim 1 simply means including, but not limited to, the listed steps.

### b. "preformed endless loop"

Callicrate asks the Court to construe the phrase "preformed endless loop" to mean "a loop (already formed) of material." NAIC seeks the following interpretation: "a loop of ligation

---

[64]*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1344-45 (Fed. Cir. 2003) (citing *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)).

[65]*Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 446 (S.D.N.Y. 2002) (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001)).

[66]*Amgen Inc.*, 314 F.3d at 1345 (citing *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997)).

material regardless of size having either a unitary, circular structure, or formed by joining the ends of linear length of material." NAIC's interpretation is based, not on claim construction principles, but rather on the principles of collateral estoppel.

Collateral estoppel, commonly referred to as issue preclusion, precludes the re-litigation of issues actually litigated and determined in a previous action.[67] Issue preclusion is only appropriate if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.[68]

NAIC argues that Callicrate is collaterally estopped from relitigating the meaning of the phrase "preformed endless loop," because an identical phrase was construed in a patent infringement suit in the District of Montana (the Montana action).[69] In support of this proposition, NAIC directs the Court to cases applying collateral estoppel to claims of patent invalidity and patent infringement. Neither NAIC nor Callicrate proffer a case applying or refusing to apply collateral estoppel in *Markman* proceedings. The Court notes that the law regarding collateral estoppel in claim construction proceedings is unclear at best.[70] The Federal Circuit has provided little guidance on the issue, and courts are split on the question of whether

---

[67]*See Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971).

[68]*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984); *see also Masco Corp. v. United States*, 49 Fed. Cl. 337 (2001).

[69]*See Callicrate v. Wadsworth Mfg., Inc.* 217 F. Supp. 2d 1101 (D. Mont. 2002).

[70]*Kim v. Earthgrains Co.*, No. 01 C 3895, 2005 WL 66071 at *10 (N.D. Ill. Jan. 11, 2005) (collecting and analyzing cases).

33

prior claim construction should be given preclusive effect in later proceedings.[71]

In this case, the Court need not decide whether the claim construction in the Montana action should be given preclusive effect in this case, because the issue before this Court is not identical to the issue decided by the Montana court.  The Montana action involved the '329 patent, *not* the '507 patent here at issue.  In construing the phrase "preformed endless loop," the Montana court looked to the specification of the '329 patent.  Yet, the specification of the '329 patent differs from the specification of the '507 patent.  For instance, Callicrate teaches a novel method to form an endless loop in the '507 patent by connecting two ends of the ligature material by puncturing one end of the ligature material and inserting the other end through the opening.  This method of forming an endless loop does not appear in the '329 patent.  Thus, although the phrase "preformed endless loop" of the '329 patent was construed by the Montana court, that prior construction is not identical to the Court's construction of the same phrase in the '507 patent.  The issues cannot be identical because the specifications and prosecution histories, the intrinsic evidence used to construe the allegedly identical claims, differ.[72]  Consequently, the Court rejects NAIC's collateral estoppel argument.

Because the Court does not find that Callicrate is collaterally estopped from litigating the

---

[71]*Id.* (citing *Abbott Labs. v. Dey, L.P.*, 110 F. Supp. 2d 667 (N.D. Ill. 2000) (applying issue preclusion, but engaging in its own claim construction to determine if previous construction was plainly wrong); *Nilssen v. Motorola, Inc.*, 80 F. Supp. 2d 921, 924 n.4 (N.D. Ill. 2000) (respect accorded prior construction but no preclusive effect); *Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580 (E.D. Tex. 2002) (finding a court may defer to a prior construction, but is not bound by it); *Graco Children's Prods., Inc. v. Regalo Int'l, LLC*, 77 F. Supp. 2d 660 (E.D. Pa. 1999) (no preclusive effect); *TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 72 F. Supp. 2d 370 (S.D.N.Y. 1999) (issue preclusion applies)).

[72]*See Mallinckrodt, Inc., v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1149-50 (C.D. Cal. 2003), which went even further holding that the construction of patent claims in prior infringement litigation did not collaterally estop the patentee from arguing a different construction of similar language in different patents in a subsequent infringement suit, even though old patent and two of the new patents shared common specifications.

construction of the phrase "preformed endless loop" appearing in claim 1 of the '507 patent, the Court must construe the phrase. The plain meaning of the term "preform" is "to form or shape beforehand."[73] The ordinary meaning of the term "endless" is "joined at the ends."[74] The specification further defines the phrase "preformed endless loop" as a loop "formed prior to the insertion of any band material into a ligature device." According to the claim language and specification, the Court therefore defines the phrase "preformed endless loop" to mean "a loop of ligation material formed by joining together the ends of the material prior to the insertion of any material into the ligature device."

**2. Claims 32 and 33**

The parties also disagree on the construction of elements found in both claims 32 and 33.

Claim 32 discloses:

> A method for litigating an animal body part, comprising:
> attaching an endless loop of elastomeric material to a ligation tool;
> passing said loop around a body part of animal to be ligated;
> pulling said loop using said tool to tighten said loop around said body part;
> pivoting a lever having a rearward end and a forward end, said lever pivotally mounted on said body for crimping a grommet about said loop so they [sic] said loop maintains pressure about said body part or [sic] said animal, said lever being movable from a retracted position to an extended position, whereby urging of said rearward end of lever downwardly to attain said extended position causes said forward end of said lever to deform said grommet; and
> wherein said step of pivoting includes rotating said lever about a pivot positioned adjacent to a receptacle for positioning the grommet.

Likewise, claim 33 discloses:

> A method for litigating an animal body part, comprising:
> attaching are [sic] endless loop of elastomeric material to a ligation tool;

---

[73]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 919 (10th ed. 1996).

[74]*Id.* at 381.

passing said loop around a body part of an animal to be ligated;
pulling said loop using said tool to tighten said loop around said body part;
pivoting a lever having a rearward end and a forward end, said lever pivotally
mounted on said body for crimping a grommet about said loop so that said loop
maintains pressure about said body part of said animal, said lever being movable
from a retracted position to an extended position, whereby urging of said
rearward end of lever downwardly to attain said extended position causes said
forward end of said lever to deform said grommet; and
wherein said step of pivoting includes rotating said rearward end of said lever
toward the animal being ligated.

Like claim 1, the parties again disagree on the meaning of the term "comprising." In addition,

the parties propose different interpretations of the phrase, "endless loop of elastomeric material,"

the second element of claims 32 and 33. Lastly, the parties disagree on the construction of the

phrase, "passing said loop around a body part of [an] animal to be ligated," the third element of

both claims.

**a. "comprising"**

As in claim 1 of the '507 patent, the parties disagree on the interpretation of the term

"comprising" in claims 32 and 33. Callicrate seeks to define the term as "including the

following steps, while NAIC argues that the term "comprising" suffices. In their discussion of

claims 32 and 33, the parties parrot the arguments made to support their interpretation of

"comprising" in claim 1. Thus, the Court need not analyze anew these arguments. Rather, the

Court construes the term "comprising" consistent with its construction in claim 1 to mean

including, but not limited to, the listed steps.

**b. "endless loop of elastomeric material"**

Callicrate argues that the phrase "endless loop of elastomeric material" must be construed

to mean "a continuous loop of material having elastic qualities." NAIC seeks the following

interpretation: "a loop of ligation material regardless of size having either a unitary, circular

36

structure, or formed by joining the ends of linear length of material."  NAIC again relies on the

principles of collateral estoppel, not claim construction, to support its proffered interpretation.

NAIC argues that Callicrate is collaterally estopped from relitigating the meaning of the

phrase "endless loop of elastomeric material," because a similar phrase was construed in a patent

infringement suit in the District of Montana.  As previously articulated, the Montana action

involved the '329 patent, not the '507 patent here at issue.  Moreover, the language of the

asserted claims in the '507 patent is *not identical* to the language construed in the Montana

action.  For instance, the '329 patent refers to a "preformed endless loop of elastomeric ligature

material," while the claim language at issue in the '507 patent is an "endless loop of elastomeric

ligature material."  Even if the language of the claims was identical, the patents have different

specifications and different prosecution histories.  For all of these reasons, the Court finds that

the issue to be decided in this lawsuit is not identical to the one decided in the Montana action,

precluding the application of collateral estoppel.

The Court must not defer to the claim construction in the Montana action, but instead,

must construe the phrase "endless loop of elastomeric material" according to the canons of claim

construction.  The Court thus looks to the plain and ordinary meaning of the claim language.  As

stated previously, the term "endless" means, "joined together at the ends."[75]  The word

"elastomeric" means, any of the various elastic substances resembling rubber."[76]  According to

its plain meaning, the Court thus construes the phrase "endless loop of elastomeric material" to

mean "a loop of ligation material having elastic qualities formed by joining together the ends of

---

[75]*Id.*

[76]*Id.* at 370.

37

the material."

**c. "passing said loop around a body part of [an] animal to be ligated"**

Finally, the parties disagree about the meaning of the phrase "passing said loop around a body part of [an] animal to be ligated."  Callicrate argues that the phrase should be construed as follows: "passing the loop around a body part of an animal to be ligated."  On the other hand, NAIC argues that the claim means "passing said loop around a body part of an animal to be ligated; without stretching said loop."

The language in claims 32 and 33 does not include a limitation that the loop pass around a body part without being stretched.  Thus, the claim language supports Callicrate's proposed claim interpretation.  The Court notes that although NAIC's proposed construction seeks to add elements not present in the claim language itself, NAIC does not even address this issue in its *Markman* brief.  The Court has examined the specification and finds no requirement that the ligation loop pass over the body part without stretching.  Thus, the Court declines to read this limitation into its construction of the phrase "passing said loop around a body part of [an] animal to be ligated," and instead adopts Callicrate's proposed construction.

The Court has summarized its interpretations of the disputed claim terms of the '507 patent in the table below:

| Claim Language | Court's Construction |
|---|---|
| comprising (claims 1, 32 & 33) | including, but not limited to, the listed steps |
| preformed endless loop (claim 1) | a loop of ligation material formed by joining together the ends of the material prior to the insertion of any material into the ligature device |

| Claim Language | Court's Construction |
|---|---|
| endless loop of elastomeric material (claims 32 and 33) | a loop of ligation material having elastic qualities formed by joining together the ends of the material |
| passing said loop around a body part of [an] animal to be ligated (claims 32 and 33) | passing the loop around a body part of an animal to be ligated |

## Motion to Dismiss

Callicrate and No-Bull seek dismissal of NAIC's collateral estoppel affirmative defense/counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. A court may dismiss a claim for failure to state a claim upon which relief can be granted.[77] Dismissal is appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.[78] The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true.[79]

On a Rule 12(b)(6) motion, a court judges the sufficiency of the complaint, accepting as true the well-pleaded factual allegations and drawing all reasonable inferences in favor of the plaintiff.[80] The court construes the allegations in the light most favorable to the plaintiff.[81] These deferential rules, however, do not allow the court to assume that a plaintiff can prove facts that it has not alleged nor that the defendants have violated the laws in ways that have not been

---

[77]Fed. R. Civ. P. 12(b)(6).

[78]*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citation omitted).

[79]*Mounkes v. Conklin*, 922 F. Supp. 1501, 1506 (D. Kan. 1996) (quotation omitted).

[80]*Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir. 1987).

[81]*Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

alleged.[82]  If the facts narrated by the plaintiff "do not at least outline or adumbrate" a viable

claim, the complaint cannot pass Rule 12(b)(6) muster.[83]  Dismissal is a harsh remedy to be used

cautiously so as to promote the liberal rules of pleading while protecting the interest of justice.[84]

Callicrate and No-Bull contend that NAIC's collateral estoppel affirmative

defense/counterclaim must be dismissed.  In response, NAIC argues that claims 1-7, 32 and 33

of the '507 patent "are substantially similar in wording and nearly identical in scope" to certain

claims of the '329 patent and U.S. Patent No. 5,997,553 (the '553 patent), which were found

invalid by a jury in the Montana action.  Since the claims in the '507 patent are similar to claims

that have been invalidated, NAIC urges that Callicrate and No-Bull are collaterally estopped

from relitigating the validity of the claims.

Unlike the confused state of the law of collateral estoppel in claim construction

proceedings, the law of collateral estoppel when patents have earlier been declared invalid is

settled.  In *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*,[85] the

Supreme Court held that "once the claims of a patent are held invalid in a suit involving one

alleged infringer, an unrelated party who is sued for infringement of those claims may reap the

benefit of the invalidity decision under the principles of collateral estoppel."[86]  Mutuality of

---

[82]*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

[83]*Mounkes*, 922 F. Supp. at 1506 (D. Kan. 1996) (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (quotation omitted)).

[84]*Id.*

[85]402 U.S. 313 (1971).

[86]*Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994) (summarizing the Supreme Court's holding in *Blonder-Tongue*).

estoppel is no longer required.[87]  "Thus, the benefits of collateral estoppel arising from a final judgment of patent invalidity were extended to an alleged infringer other than the defendant who earlier successfully litigated the matter and those in privity therewith."[88]

For Callicrate and No-Bull to be estopped from litigating the construction of the '507 patent, all the requirements necessary for collateral estoppel to apply must be met.  As previously stated, collateral estoppel is only appropriate if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.[89]  The party asserting a collateral estoppel defense bears the burden of demonstrating that the identical issue was decided in the prior proceeding, while the party against whom the collateral estoppel is asserted bears the burden of showing the absence of a fair and full opportunity to litigate.[90]

NAIC must establish that the validity of claims 1-6, 32 and 33 in the '507 patent are identical to the issues decided by the Montana court.[91]  The Montana action between Callicrate and Wadsworth Manufacturing involved patents '329 and '553.  In the Montana action, the jury found that claims 7, 11, 18, 19, 22, 25, 27 and 30 of the '329 patent were anticipated by Wadsworth and invalid due to obviousness.  The jury similarly found that claims 11-13, 16 and

---

[87]*Id.*

[88]*Id.*

[89]*A.B. Dick Co.*, 713 F.2d at 702.

[90]*Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301, 314 (S.D.N.Y. 2004).

[91]*See Blonder-Tongue*, 402 U.S. at 333 (noting a defendant, asserting a collateral estoppel plea, must identify "the issue in suit as the identical question finally decided against the patentee . . . in previous litigation").

18 of the '553 patent were anticipated by Wadsworth and invalid due to obviousness.  None of these invalidated claims are being asserted by Callicrate in this action.

Notwithstanding that the Montana court did not even address the '507 patent, NAIC argues that the "identical issue" element of collateral estoppel is met because the claims of the '329 and '553 patents invalidated in the Montana action are substantially similar to claims at issue in this action.  Notably, NAIC cites no legal authority for the proposition that the invalidity of a claim of one patent somehow collaterally estops a patent holder from later litigating the validity of other claims in different patents.  The Court's independent research has uncovered few cases in which litigants took the position NAIC now takes.

*Comair Rotron, Inc. v. Nippon Densan Corp*[92] is instructive.  In that case, the Federal Circuit reversed the decision of the district court, which had held that the invalidity of one patent collaterally estopped the patent holder from relitigating the validity of both the patent that had been invalidated and a separate "related" patent that had not been invalidated.[93]  The Federal Circuit held this reasoning to be error for "separate patents describe separate and distinct inventions," such that "it can not be presumed that related patents rise and fall together."[94]  Thus, a prior "decision concerning the claims of [one] patent cannot bar a later suit on the separate and distinct claims of [another] patent."[95]  Because the issue for which estoppel is sought must have been raised, submitted for determination, and actually determined in the first action, and because

---

[92] 49 F.3d 1535 (Fed. Cir. 1995).

[93] *Id.* at 1539.

[94] *Id.*

[95] *Id.* at 1540 (Rader, J., concurring).

42

all of these requirements were lacking, the Federal Circuit reversed the district court's decision.[96]

As in *Comair Rotron, Inc*, NAIC impermissibly asks this Court to collaterally estop Callicrate and No-Bull from asserting claims 1-6, 32 and 33 of the '507 patent because these claims are similar to claims previously found invalid.  This position ignores the precept that "each patent, by law, covers a[n] independent and distinct invention,"[97] and is contrary to established patent principles.

Moreover, the Court notes that the claims of the '329 and '553 patents invalidated in the Montana action are not identical, nor even substantially similar to the claims of the '507 patent at issue here.  NAIC has not even attempted to summarize the issues in the Montana action which are allegedly similar to the issues before this Court.  Instead, NAIC baldly asserts that the issues are "the same" and then urges the Court to undertake an examination of a chart, which lists the '507 patent claims and the invalided claims in patents '329 and '553.  This chart, however, belies NAIC's assertion, as many differences between the previously invalidated claims and the '507 patent claims are readily apparent.  NAIC does not address how the claims can be identical when they include different elements and therefore, presumably teach different inventions.

To support the invalidity of claim 32 of the '507 patent, NAIC directs the Court to the file history, specifically to an argument submitted by Callicrate during prosecution.  In arguing that what is now claim 32 from the '507 patent was patentable, Callicrate stated:

> Finally, Applicant submits that new Claims 53 and 54 are patentable over the Wadsworth '704 patent and yet do not rely upon the use of a preformed endless loop of ligation material.  Applicant contends that such method claims are (and must be) read consistently with the scope of claim protection previously sought

---

[96]*Id.* at 1539.

[97]*Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1556 (Fed. Cir. 1996).

and awarded for a tool for ligating a body part as set forth in U.S. Patent No. 5,
997,553, Claim 11.

It is unclear from the prosecution history whether the Examiner agreed that claim 32 of the '507

patent was patentable because its scope was similar to claim 11 of the '553 patent.

What is clear, however, is that claim 11 of the '553 patent and claim 32 of the '507 patent

are not identical, nor substantially similar.  The Court has set forth claim 11 of the '553 patent

and claim 32 of the '507 patent below to illustrate the dissimilarity of the two claims:

| Claim 11 of the '553 Patent | Claim 32 of the '507 Patent |
| --- | --- |
| 11. A tool for ligating a body part, comprising: an elongated tool body having a forward end and rearward end, said rearward end having a handle and said forward end having a means for receiving elastomeric ligature material; means for pulling said ligature material towards said rearward end of said tool body, said means for pulling interconnected to said tool body; and a lever pivotally mounted on said tool body for deforming a grommet positioned in said means for receiving. | 32. A method for ligating an animal body part, comprising: attaching an endless loop of elastomeric material to a ligation tool; passing said loop around a body part of animal to be ligated; pulling said loop using said tool to tighten said loop around said body part; pivoting a lever having a rearward end and a forward end, said lever pivotally mounted on said body for crimping a grommet about said loop so they (sic) said loop maintains pressure about said body part or (sic) said animal, said lever being movable from a retracted position to an extended position, whereby urging of said rearward end of lever downwardly to attain said extended position causes said forward end of said lever to deform said grommet; and wherein said step of pivoting includes rotating said lever about a pivot positioned adjacent a receptacle for positioning the grommet. |

Some of the more obvious differences are that: (1) claim 32 is a method claim, whereas claim 11

is a tool claim; (2) claim 32 teaches the use of "an endless loop of elastomeric material," while

claim 11 merely refers to "elastomeric ligature material"; (3) claim 32 teaches the use of a "lever

being movable from a retracted position to an extended position," while claim 11 does not; and

(4) claim 34 discloses that "urging of said rearward end of lever downwardly to attain said

extended position causes said forward end of said lever to deform said grommet," whereas claim

44

11 merely refers to "a lever pivotally mounted on said tool body for deforming a grommet," without explaining how the grommet will be deformed.  Thus, the Court concludes that claim 32 of the '507 patent is not identical to claim 11 of the '553 patent, such that Callicrate and No-Bull are not estopped from asserting infringement of claim 32 of the '507 patent.

Finally, NAIC argues that Callicrate effectively admitted that the scope of the '507 patent was the same as the '329 patent, by filing a terminal disclaimer during the prosecution of the '507 patent.  To understand NAIC's argument, the Court must explore the issue of double patenting.  Double patenting comes in two forms: "same invention" double patenting and "obviousness-type" double patenting.[98]  In *In re Lonardo*,[99] the Federal Circuit distinguished between the two types of double patenting as follows:

> "Same invention" double patenting is based upon 35 U.S.C. § 101 (1994), which states that an inventor may obtain "a patent" for an invention. The statute thus permits only one patent to be obtained for a single invention, and the phrase "same invention" refers to an invention drawn to substantially identical subject matter.  Obviousness-type double patenting, on the other hand, is judicially created and prohibits an inventor from obtaining a second patent for claims that are not patentably distinct from the claims of the first patent.[100]

Claims are not patentably distinct when they are "directed to mere obvious modifications of, or improvements on, inventions defined in the claims of patents already issued to the same inventors."[101]  It is this obviousness-type double patenting that is pertinent to NAIC's terminal disclaimer argument.

---

[98]*In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985).

[99]119 F.3d 960 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1147 (1998).

[100]*Id.* at 965.

[101]*In re: Van Ornum*, 686 F.2d 937, 942 (C.C.P.A. 1982).

45

A terminal disclaimer refers to a procedure by which patent applicants obviate and thereby cure an obviousness-type double patenting rejection by disclaiming any rights in the second application after the expiration date of the original patent.[102]  The filing of a terminal disclaimer is a convenient response to an obvious-type double patenting rejection because while any enlargement of the term of exclusivity is eliminated, the patentee still enjoys some limited protection for his later developments.[103]  The option of filing a terminal disclaimer is not available to cure rejections based on "same invention-type" double patenting.[104]

Because Callicrate filed a terminal disclaimer during prosecution of the '507 patent, which limited the term of the '507 patent to that of the '329 patent, NAIC argues that the patent claims cover the same subject matter.  Yet a terminal disclosure is not evidence that two patents are identical, but rather suggests otherwise.  Indeed, NAIC provided no authority to suggest that the filing of a terminal disclaimer limiting the term of the second patent to that of the first patent indicates that identical issues are involved in both patents.[105]  The Court concludes that the terminal disclaimer does not render the issue involved in the Montana action – the validity of the '329 patent, and the issue before this Court – the validity of the '507 patent, identical for purposes of collateral estoppel.

Because the Court finds that Callicrate and No-Bull have not admitted that the '329 patent and the '507 patent involve identical issues either by filing a terminal disclaimer or

---

[102]See 35 U.S.C. § 253 (stating that any patentee or applicant can "disclaim or dedicate to the public the entire term, or any terminal part of any term, of any patent granted or to be granted").

[103]Quad Envtl. Tech. Corp. v. Union Sanitary Dist., 946 F.2d 870, 873 (Fed. Cir. 1991).

[104]See id. at 874; In re Van Ornum, 686 F.2d at 942 (nothing that a terminal disclaimer cannot be used to overcome a double patenting rejection when the claimed inventions are identical).

[105]Worse, Callicrate and No-Bull do not even address NAIC's terminal disclaimer argument.

otherwise, and because the Court's independent analysis of the '329 and the '507 patents shows

that the patents are far from identical, the Court rejects NAIC's invitation to apply collateral

estoppel in this case.  The Court concludes that NAIC has failed to bear its burden of proving

that the issues litigated in the Montana action are identical to the issues before this Court.

Therefore, the Court therefore grants Callicrate and No-Bull's motion to dismiss NAIC's

collateral estoppel affirmative defense/counterclaim.

**IT IS THEREFORE ORDERED BY THE COURT** that the disputed terms and

phrases of the '329 '507 patents are construed as set forth in this Order.

**IT IS FURTHER ORDERED** that Callicrate and No-Bull's Motion to Dismiss NAIC's

Affirmative Defense/Counterclaim for Collateral Estoppel (Doc. 64) is GRANTED.

IT IS SO ORDERED.

Dated this 27th  day of April 2005.


 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge